**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

In re:                                          )
                                                )
William B. Ogletree,                            )          Case No.: 04-04001-BGC-7
                                                )
          Debtor.                               )
                                                )
Dennis Joslin Company,                          )
                                                )
          Plaintiff,                            )
                                                )
vs.                                             )          A. P. No.: 04-00139
                                                )
William B. Ogletree,                            )
                                                )
          Defendant.                            )


**MEMORANDUM OPINION**

The matter before the Court is a <u>Complaint to Determine Dischargeability of Debt Under 11 U.S.C. 523 and Objection to Discharge Under 727</u> filed on August 11, 2004.

On December 17, 2004, the Court entered a <u>Memorandum Opinion and Order</u>. That order denied the debtor's oral motion to dismiss <u>Count One</u> of the plaintiff's complaint, which count was based on section 523(a)(2)(B) of the Bankruptcy Code. But in that same order, the Court granted the debtor's oral motion to dismiss <u>Count Two</u> of the complaint. That count was based on section 727(a) of the Bankruptcy Code. Therefore, the only action remaining is one under section 523.

The Court scheduled a trial on the section 523 count for January 12, 2005. The trial was continued by agreement to March 9, 2005; then to April 27, 2005; and then to July 7, 2005. The trial was held on July 7, 2005. Appearing were: the Defendant-debtor, William B. Ogletree; his attorney Ted Stuckenschneider; Sherrie Phillips, the attorney for the Plaintiff; Mark Harber, a witness; and Ray Smith, a witness.

The matter was submitted on the testimony, documents and exhibits admitted into evidence, the pleadings, and arguments and briefs of counsel. Written arguments included a <u>Written Closing Argument</u> filed by the debtor on July 14, 2005 and a <u>Closing Statement of Plaintiff Dennis Joslin Company</u> filed by the plaintiff on July 27, 2005.

The plaintiff contends that the debtor's listing, on a financial statement, of his interest in a family trust, was false and intended to deceive the plaintiff's predecessor

into giving the debtor a loan. The plaintiff concludes that the debtor's actions make the debt represented by that loan nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code.

## I. FACTS

### A. The Trust

On March 2, 1973, Mr. John A. Ogletree, the debtor's father, established a trust. The trustee of the trust is Republic National Bank of Dallas. Pursuant to the trust agreement, Mr. Ogletree made the trustee the beneficiaries of his life insurance policies and directed the trustee, upon his death, to divide the proceeds of those policies between two trusts. The purpose of the first trust, which is designated in the instrument as "Trust A," is to provide for the welfare and support of Mr. Ogletree's wife, Mrs. Floy B. Ogletree. The trust instrument requires the net income from "Trust A" is to be paid to Mrs. Ogletree quarterly and furthermore stipulates that the trustee may make supplemental distributions to her from the trust principal to the extent that, at any time, the trust income, together with income and principal available to her from other sources, should prove inadequate for her health, maintenance and support in accordance with her station in life. In addition, under the terms of the instrument, Mrs. Ogletree has the discretionary power to withdraw additional funds from the principal of the trust annually for any purpose in an amount not exceeding the greater of $5,000.00 or 5% of the undistributed principal.

The purpose of the second trust, which is designated in the instrument as "Trust B," is two fold. One is to provide for Mrs. Ogletree's health, maintenance, and support in the event the income from "Trust A" should at any time prove insufficient for that purpose. To that end, the trust instrument requires the trustee to distribute to Mrs. Ogletree so much of the income from "Trust B" as, when combined with other income available to her, will adequately provide for her health, maintenance, and support.

The second purpose of "Trust B" is to provide for the health, education, maintenance, and support of Mr. Ogletree's four children, one of whom is the debtor in this case. To that end, the trust instrument requires the trustee to distribute to Mr. Ogletree's children so much of the income from "Trust B" that has not been distributed to Mrs. Ogletree as will adequately provide for their health, education, maintenance, and support.

The instrument authorizes the trustee to make supplemental distributions to Mrs. Ogletree and the children from the principal of "Trust B" any time the trust income, together with income and principal available to them from other sources, should prove inadequate for their health, education, maintenance and support, provided that no such distributions from principal may be made to Mrs. Ogletree until "Trust A" is entirely exhausted. Upon the exhaustion of "Trust A," Mrs. Ogletree is, in addition, entitled to withdraw additional funds from the principal of "Trust B" annually for any purpose in an amount not exceeding the greater of $5,000.00 or 5% of the undistributed principal.

2

The instrument further authorizes the trustee to distribute income and principal of "Trust B" to Mr. Ogletree's mother and stepfather, and to Mrs. Ogeltree's mother, if they have need of it to provide for their health, maintenance, and support, and if sources of income otherwise available to them are insufficient for that purpose.

The instrument provides for whatever remains of the trust upon the death of the last to die of Mr. Ogletree and his wife to be divided equally among his children and his children's descendants, per stirpes. However, if any of those children who survive Mr. Ogeltree and his wife shall not on that occasion have attained the age of 25, then the instrument requires that the shares of all of the children remain in trust until the youngest child reaches the age of 25. At that time each child will receive one-third of his or her share, and that the remainder of the trust property continue to be held in trust until the youngest child reaches the age of 30. On that occasion, each child will receive one-half of the remainder of his or her share, and that the remainder of the trust property continue to be held in trust until (1) the youngest child reaches the age of 35 and (2) Mr. Ogletree's mother and step-father and Mrs. Ogletree's mother are all deceased, at which time each child will receive all that remains of his or her share free and clear of the trust.

## B. The Loan

On April 20, 1998, the debtor borrowed $85,000 from Commerce Bank of Alabama. The note which evinces that indebtedness required the debtor to make 11 monthly payments of $1,500 each, plus a balloon payment of $75,362.41 on April 20, 1999. Plaintiff's Exhibit 2. The debtor assigned a $500,000 life insurance policy to the bank as security for the loan. The note bears "loan number 8300645" and reflects that the purpose of the loan was for "income taxes and personal expense."

On April 20, 1999, the bank allowed the debtor to renew the debt by executing a second note for $74,921.01, which subsumed the balance due on the first note. The second note required the debtor to make 11 monthly payments of $1,500 each plus a balloon payment of $64,358.09 on April 20, 2000. The life insurance policy remained assigned to the bank as security for the second note. The second note bears the same loan number as the first, "8300645," and reflects that the purpose of the loan was to "renew loan 8300645."

On September 2, 1999, the bank allowed the debtor to renew the debt by executing a third note for $85,060, which subsumed the balance due on the second note and apparently provided the debtor with additional funds. The third note required the debtor to make 11 monthly payments of $1,500 each plus a balloon payment of $75,898.60 on September 15, 2000. The life insurance policy remained assigned to the bank as security for the third note. The third note bears "loan number 60005689" and reflects that the purpose of the loan was for "personal expense."

3

On December 18, 2000, the bank allowed the debtor to renew the debt by executing a fourth note for $62,742.25, which subsumed the balance due on the third note. The fourth note required the debtor to make 3 quarterly payments of approximately $1,500 each (the interest rate was variable) plus a balloon payment of $64,230.96 on December 18, 2001. The life insurance policy remained assigned to the bank as security for the fourth note. The fourth note bears "loan number 60022875," and reflects that the purpose of the loan was to "renew loan 60005689."

The fourth note represents the final renewal of the debt owed by the debtor to the bank. The debtor failed to pay the note. On April 1, 2002, the bank sold the note to Dennis Joslin Company, LLC (hereinafter referred to as "Joslin") as part of an all-or-nothing package where Joslin purchased a group of approximately 200 notes for $510,000. At the time, those notes had an aggregate principal balance of $5,128,250.10. Therefore, the balance on the debtor's loan represented only approximately one and a quarter percent (.0126) of the aggregate principal balance of the loans purchased by Joslin from the bank.

## C. The Financial Statement

The debtor filed the present Chapter 7 case on May 4, 2004. Joslin filed the pending adversary proceeding on August 11, 2004.

The statutory basis of Joslin's adversary proceeding is 11 U.S.C. § 523(a)(2)(B). The sole factual basis of Joslin's adversary proceeding relates to one asset and one entry in a financial statement the debtor gave to the bank. The asset was the debtor's interest in his deceased father's trust and the entry was one contained in a financial statement given by the debtor to the bank in conjunction with the second note which he executed on April 20, 1999. Joslin contends that this one entry was false, and that Joslin substantially relied on that entry in making its decision to purchase the loan package from the bank.

At the bank's insistence, the debtor provided the bank with the financial statement on April 16, 1999. Plaintiff's Exhibit 3. On the financial statement, the debtor stated that his yearly income from wages and salary was $126,000; that his monthly expenses were $3,100; that he owned assets which he valued at $664,181.42; that he owed noncontingent liabilities of $120,000 (including the debt to the bank) and contingent liabilities of $250,000; and that he had a net worth of $544,181.42. By far, the primary source of the debtor's net worth at the time was, according to the financial statement, his personal residence, which was unencumbered, and to which he assigned a value of $450,000.

The financial statement consists of information supplied by the debtor on a preprinted form provided to him by the bank. The form is 2 pages in length. It is very simple, very basic, very structured, and very brief and to the point. By its form, it seeks basic information and allows for little in the way of elaboration beyond those basics. On

4

the first page, the form lists preprinted generic categories of assets including "Cash," "Government & Readily Marketable Securities," "Non-Marketable Securities," "Notes and Accounts Receivable," "Personal Residence," "Other Real Estate," "Cash Value of Life Insurance," "IRA'S, Keoughs & Other Qualified Plans," and "Other Assets."

Beside each such category, the form provides columns for placing the total value of all of the assets which fall within the particular generic categories. That particular section of the form does not request nor require the person completing the form to provide a detailed itemization or description of the assets which fall within the generic categories. Similarly, there is no room or space provided or available in that particular section of the form for particularly itemizing or describing the assets which purportedly fall within the generic categories. However, limited space is provided on the second page of the form for briefly itemizing and describing assets which fall within the generic categories "Cash," "Government and Readily Marketable Securities," "Non-Marketable Securities," "Real Estate," and "Life Insurance." But no space is provided for itemizing or describing the assets which fall within the generic categories "Notes and Accounts Receivable," "IRA'S, Keoughs & Other Qualified Plans," and "Other Assets."

The first page of the form also lists generic categories of noncontingent liabilities, contingent liabilities, sources of income, and particular types of expenses. It also provides, to the right of each category, a narrow space for: summarizing total amounts owed on debts which fall within the particular generically described categories of debts; amounts realized from the particular generically described possible sources of income; and amounts paid out each month for expenses which fall within the particular generically described possible expenses. The form does not request nor require the person completing the same to provide a detailed itemization or description of the items which purportedly fall within those generic categories. Moreover, other than providing limited space on page 2 for brief elaboration regarding "Notes Payable," the form does not provide on either page any space for particularly itemizing, or describing, or elaborating on any of the liabilities, income sources and amounts, or expenses which fall within the generic categories listed on page 1.

The debtor placed the following figures on the first page of the financial statement in the columns provided for stating the cumulative amounts or values of property which he owned that fell within the generic categories designated on the form. Those are:

$2,000.00 in the category labeled "Cash;"
$450,000.00 in the category labeled "Personal Residence;"
$5,000.00 in the category labeled "Personal Property;"
$11,422.60 in the category labeled "Cash Value of Life Insurance;"
$95,758.82 in the category labeled "IRA'S, Keoughs & Other Qualified Plans;"
and $100,000.00 in the category labeled "Other Assets."

Case 04-00139-BGC    Doc 34    Filed 01/05/06    Entered 01/05/06 11:21:33    Desc Main
Document    Page 5 of 31

Directly beside the printed words "IRA'S, Keoughs & Other Qualified Plans," in the same column where those words appear, the debtor handwrote the following: "IRA & 401-K." Directly beside the printed words "Other Assets," in the same column where those words appear, he wrote, "John F. Ogletree Estate Trust - Nations Bank."

The latter entry relating to the debtor's interest in a trust forms the sole and entire basis of the plaintiff's complaint in this case. No other "Other Assets" were itemized or described by the debtor on the form and the form bears no further elaboration or description of the debtor's interest in the trust other than the handwritten phrase, "John F. Ogletree Estate Trust - Nations Bank," followed in the next column by the figure "$100,000.00."

Indeed, the form provides no designated area for itemizing or providing any description of any "Other Assets" owned by the prospective borrower, much less an elaborate or detailed description, and it obviously contemplates that the prospective borrower would not itemize or provide a description of any "Other Assets" that he or she might own. It would, instead, merely allow a borrower to assign a cumulative monetary value for all assets other than those which fell in the other particularly described printed categories. And there is no otherwise undesignated place on the form where an adequate description of the debtor's interest in the trust could have been placed without infringing on spaces specifically provided for the provision of other information. Moreover, the form does not ask for that information. Nor, as a result of its limited size and structured format, does it either invite, encourage, or allow for the submission of that information.

## II. APPLICABLE LAW

### A. Bankruptcy Code

Section 523(a)(2)(B) of the Bankruptcy Code makes nondischargeable debts for

money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and that the debtor caused to be made or published with intent to deceive....

11 U.S.C. § 523(a)(2)(B).

Under that section of the bankruptcy code, a debt is nondischargeable:

where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services, or

6

credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive.

Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

## B.  Burden of Proof

The creditor who claims that its particular debt is not dischargeable has the burden of proving each of those elements by a preponderance of the evidence.  Id.  If that burden is not met as to any one of those elements, the debt is dischargeable.  Id.

## C.  Standard of Review

The mandate for this Court according to the Court of Appeals for the Eleventh Circuit Court is for this Court to construe statutory exceptions to discharge liberally in favor of the debtor, so as to, "[ensure] that the 'honest but unfortunate debtor' is afforded a fresh start."  Id. (quoting Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir.1985)).  Furthermore, " ' "The reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural." ' "  Id.  (quoting In re Tully, 818 F.2d 106, 110 (1st Cir.1987)(quoting Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir.1934))).

"[I]t is not sufficient that the materially false statement referred to in [section 523(a)(2)(B)] is untrue, erroneous, or mistaken; such statement, in order to constitute a bar to the discharge of the bankrupt, must be false in the sense that it is intentionally untrue."  Hartsfield Co. v. Smith, 61 F.2d 723, 724 (5th Cir. 1932).

## III.  ADDITIONAL FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

### A.  The debtor did not provide a false written statement
### to the bank and the bank was not misled by anything
### the debtor included on the financial statement.

Joslin failed to prove the required elements for a determination of nondischargeability under section 523(a)(2)(B).  First, Joslin did not produce any evidence that the debtor put information on his financial statement that was in anyway false or misleading.  The form the debtor completed for the lender required a terse description of assets.  It neither required, nor contemplated, a detailed exposition.  The only space on the form available for the debtor to list his interest in the trust, which is entitled "other assets," is barely large enough for him to have written the few words that he wrote.  There is no additional area on the form where he could have provided a detailed explanation of the intricacies, restrictions, and nuances contained in the trust

7

instrument. In the limited space provided, he wrote the words "John F. Ogletree Estate Trust - Nations Bank" and in the adjacent space he assigned a value to that asset of "$100000.00." The meaning naturally conveyed by those brief words, given their plain and ordinary definitions, is clear. That is, Mr. Ogletree holds an interest in a trust established for his benefit by his late father and that interest has an approximate value of $100,000.00. That statement was entirely true and served to inform the bank accurately of the asset's existence, define the extent of the debtor's interest in it, and alert the bank to the asset's limited potential as a source from which it might collect its loan upon default.

Second, Joslin contends that the debtor's description on his financial statement of his interest in the trust misled the bank into believing either the debtor could access that interest without restriction or that the debtor's interest in the trust could be seized by creditors through collection remedies such as attachment. That contention was completely disproved by the testimony by Mr. Ray Smith. Mr. Smith was the bank officer who reviewed the financial statement and approved the renewal of the loan in April 1999.

Mr. Smith, the only witness from the bank called to testify in the case, testified that he was never under the impression that the debtor could access the trust funds without restriction; that he fully expected, based on his many years as a loan officer, that the debtor's ability to access the trust funds would be subject to limitations, restrictions, and conditions; and that he fully expected that the bank would be unable to seize the debtor's interest in the trust through ordinary collection remedies such as attachment. The following is Mr. Smith's testimony on the subject:

Q. On April 16, 1999, did you have reason to believe that any information on this personal financial statement was incorrect?

A. None.

Q. When you reviewed this personal financial statement, did you believe that Mr. Ogletree had access to the $100,000 in the Ogletree trust?

A. I did not know the details on the restrictions on that. I just knew it was an asset ....

Q. Did you ------ he could invade the principal and obtain the $100,000 if needed?

A. I don't recall discussing that. I didn't have a copy of the agreement. I could not tell you. I did not have an opinion about what he could do with that money.

8

Q. Based on how it is listed on this personal financial statement, did you have any idea or opinion about whether or not you could, excuse me, Mr. Ogletree could access the money if he needed it?

A. I did not know. I didn't have knowledge of what restrictions were on him.

Q. Did you know if there were any restrictions?

A. I did not know.

Q. Did you have any knowledge about .... did you think this was present income, in other words did you think that it was something that Mr. Ogletree felt that he could access?

A. I really don't have a detailed opinion on what he could or could not do with the money.

Q. And so when you made the credit lending decision and you based it in part on the $100,000 what did you think?

A. I thought it was an asset for which would have value and added to his net worth.

....

Q. If you assumed that it was a valid asset, what was your assumption based on?

A. The fact that he listed a $100,000 asset value in that trust. I have enough lending over time that I am aware that most trusts have restrictions on distribution. Timeliness. Many times you get the income out of them but you can't liquidate them. I knew that it was a trust. I assumed like most other trusts that I had had experience with that there were most probably some restrictions and limitations on distribution. Both timeliness, well primary on the time which it could be distributed.

....

Q. You also testified that you were aware that most trusts have some sort of requirement to get permission from a trustee or it wouldn't be a trust. Is that correct?

A. Correct.

9

Q.  So when you looked at this $100,000 trust.  Statement on the financial statement, I mean.  That statement that it's there.  Did you at that time realize that obviously for him to get any money would require some permission of a trustee?  Would that be a correct statement?

A.  And /or conditions of the trust be met.  Be it age restrictions I didn't know the details but yes I knew there would be, per the trust agreement, that there could be some restrictions.

Q.  And that it might not be available for creditors just like a 401(k) and an IRA?

A.  Right.

....


A.  Well, what I would say is he alluded to a 401(k).  We can't lien against a 401(k) but he can certainly redeem a 401(k) to pay unsecured loans. So we look at them in a similar manner.

Q.  Right, but a creditor can't go after it.  He would have to do it.

A.  That's correct.

Q.  The same would be true usually of a trust, is that correct?

A.  That's correct.

Q.  So you would not have relied on your ability to attach his trust , you would have relied on his ability to maybe go ask for it, is that correct?

A.  And use it to pay his loan back.

Unofficial Transcript of Official Court Recording on July 7, 2005.

　　　　In addition, Mr. Smith testified that, despite his expectations regarding the debtor's limited access to the trust, as well as the bank's inability to collect from the trust, he did not seek to review the trust instrument and has not, to this day, reviewed the trust instrument; and that he, to this day, does not know whether the debtor's description of his trust interest on the financial statement is accurate or not.

　　　　When debtor's counsel posed a hypothetical to Mr. Smith, which essentially described the restrictions that are imposed on the debtor's ability to access the trust funds in the trust instrument, Mr. Smith admitted that the restrictions described in counsel's hypothetical were consistent with the restrictions that he anticipated and

expected would impede the debtor's ability to access the trust. More importantly, Mr. Smith admitted, that assuming the restrictions contained in counsel's hypothetical are in fact the restrictions that are imposed on the debtor's ability to access the trust funds by the trust instrument, the description that the debtor wrote on the financial statement of his interest in the trust was accurate. Mr. Smith testified:

> Q. Now I'm going to paint a fact scenario for you. Have you had an opportunity since then to look at this trust document? Have you seen this trust document in preparation for this trial?

> A. I have not other than it was an attachment in the package that I received.

> Q. Then let me paint a picture for you here. Let's say that the trust document says that Mr. Ogletree, with the permission of the trustee, has the permission to invade the interest, and has permission to invade the principal, but has to get the permission of the trustee. And let's say it also says that the rest of the money, that the trust doesn't end, that the money doesn't pay out to Billy until his mother's death, so that she also has the power to invade it. Would that change your opinion of how its characterized on the financial statement? Or does that seem to be consistent with how he's characterized it on the financial statement?

> A. I didn't know the details.

> Q. Assuming that those are the details for a minute, is that consistent with what your opinion would have been as to how it is characterized on the financial statement?

> A. I assumed there could be restrictions.

> Q. And those types of restrictions that I just stated, and I'm not asking you to agree with me that those are the restrictions, but if those are the restrictions, are those the kinds of restrictions that you would have possibly expected?

> A. Yes.

> Q. And so those restrictions being, if those restrictions in fact were the only restrictions on that trust, then that financial statement accurately disclosed it as a trust, is that correct?

> A. Yes.

> ....

Case 04-00139-BGC    Doc 34    Filed 01/05/06    Entered 01/05/06 11:21:33    Desc Main
Document    Page 11 of 31

Q. If you have not seen the trust document, do you in fact know that Mr. Ogletree accurately reflected that trust?

A. I do not know whether he did or did not.

Unofficial Transcript of Official Court Recording on July 7, 2005.

And finally, to reiterate, Mr. Smith testified that he, to this day, does not know whether the debtor's description of the trust interest on the financial statement is accurate or not. He was asked, by Joslin's attorney, "If you have not seen the trust document, do you in fact know that Mr. Ogletree accurately reflected that trust?" He replied: "I do not know whether he did or did not." Unofficial Transcript of Official Court Recording on July 7, 2005.

**The "false statement" element of 523(a)(2)(B) requires proof that the offending representation was untrue; not that it may have been true or may have been false**. And the testimony by someone, Mr. Smith in this case, who does not know, of his own personal knowledge, whether the offending representation was untrue or not, and that he in fact does not know, of his own personal knowledge, whether the offending representation was untrue or not, is, of course, of no probative value to the plaintiff since it does not prove, or tend to prove, or suggest any inference that, the offending representation was untrue.

Mr. Smith's testimony represents the only source of evidence presented regarding whether, from the bank's perspective, the debtor put false or misleading information regarding the trust on his financial statement. In addition it is the only source of evidence whether, from the bank's perspective, the information that the debtor put on his financial statement regarding the trust was false or misleading in any way. And finally, it is the only source of evidence whether, from the bank's perspective, the bank was misled or deceived in any manner by the information that the debtor put on his financial statement regarding the trust.

Mr. Smith testified that neither he nor the bank were misled or deceived by the information that the debtor put on his financial statement regarding the trust into believing either that the debtor could access his interest in the trust funds without restriction or that the bank could seize the debtor's interest in the trust funds through statutory collection remedies. He testified that he, and therefore the bank through him, does not know whether the information that the debtor put on his financial statement regarding the trust was accurate or not. And he testified that, given the restrictions and limitations in the hypothetical posed to him by debtor's counsel, which essentially reflected in fact the restrictions and limitations imposed on the debtor's ability to access the trust funds in the trust instrument, the information that the debtor put on his financial statement regarding the trust was accurate.

12

Mr. Smith unequivocally did <u>not</u> testify or imply in any manner either that the debtor put false or misleading information regarding the trust on his financial statement; or that the information that the debtor put on his financial statement regarding the trust was false or misleading in any way; or that the bank was misled or deceived in any manner by the information that the debtor put on his financial statement regarding the trust. Consequently, the preponderance of the evidence, <u>and the only evidence</u>, proves that the debtor did not make a false or misleading statement on the financial statement, and that the bank was not misled or deceived into renewing the debtor's note either based on any such false or misleading statement or on any false impression conveyed by the information the debtor put on his financial statement regarding the trust.

Because the proof reflects that the debtor did not make a false representation to the bank, and that the bank did not rely on any false representation made by the debtor, or on any false impression conveyed by the information supplied by the debtor, the debt owed to Joslin by virtue of its assignment from the bank fails to meet the fundamental requirements for nondischargeability under 523(a)(2)(B).

### B. Even if the bank had been misled by the information that the debtor put on the financial statement about the trust, the bank could not have reasonably relied on that information.

Aside from the fact that Mr. Smith's testimony disproves any notion that the bank, in renewing the loan, relied in fact on the assumption or impression that the debtor could access the trust without restriction to repay the loan or that the bank could access the trust by statutory collection remedies, any reliance by the bank on either of those assumptions or impressions would have been imminently unreasonable.

Mr. Smith explicitly testified that, in his professional and personal experience, the rights of trust beneficiaries to access the trust always have strings attached; that trust beneficiaries must ordinarily satisfy conditions before obtaining trust funds; that trust funds are ordinarily made available to the trust beneficiaries only under certain conditions; and that trust funds are ordinarily not accessible by creditors pursuant to statutory collection remedies.

Based on Mr. Smith's testimony, the Court must conclude that it would have been unreasonable for either Mr. Smith or the bank to presume that this debtor's authority and ability to access his interest in the trust set up by his deceased father for his benefit was not subject to similar restraints. In addition, neither Mr. Smith nor the bank could presume that whatever limitations or conditions there were on the debtor's authority and ability to access the trust could be overcome or satisfied in the event the debtor defaulted on his loan, or that the bank would be able to collect from the trust through statutory collection remedies in the event the debtor defaulted on his loan. And since Mr. Smith expected and anticipated, based on his professional and personal experience, that the debtor's right to access the trust funds was probably not unconditional, and that the bank would be unable to collect from the trust funds, any reliance by him, and therefore the bank, would have been patently unreasonable.

The court in <u>Village Toyota Co. v. Stewart</u>, 433 So.2d 1150, 1154 (Ala. 1983) recognized, "If there is knowledge, or notice of facts which would have excited inquiry, or surrounding circumstances which would have aroused suspicion in the mind of a reasonable person, a plaintiff cannot be said to have relied upon a misrepresentation and cannot recover." Similarly, the court in <u>Dickinson v. Moore</u>, 468 So.2d 136, 138 (Ala. 1985) recognized, "If a party upon exercising reasonable care would have discovered the facts or have had reason to doubt the truth of the representation, the plaintiff should not recover." And where there is reason to doubt, the court in <u>Bedwell Lumber Co. V. T & T Corp.</u>, 386 So.2d 413, 415 (Ala. 1980) recognized, "We have no quarrel with the basic legal proposition that the representee's reliance must be reasonable under the circumstances; and, where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon." And that court stated, "We reaffirm the principle of the law of fraud that knowledge of such facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as notice of these other facts." <u>Id</u>. Similarly, the court in <u>Mahoney v. Forsman</u>, 437 So.2d 1030, 1033 (Ala. 1983) stated, "Where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon."

## C. The debtor did not intend to defraud the bank.

The record is also void of any evidence that the debtor intended, through the financial statement, to defraud or mislead Mr. Smith and the bank into renewing his loan. Mr. Smith did not testify that any of the information on the debtor's financial statement was false or misleading. And, Joslin does not contend that anything on the financial statement is misleading or false in any way other than the so-called misleading impression made by the information about the trust. And, in contrast, according to the financial statement, at the time the debtor gave the statement to the bank, his financial condition was good. He had a good job, a substantial income, and significant assets. The loan was not in default. He had the ability to repay the loan. He did not have any reason to believe that he would not be able to repay the loan when it came due, and he did not have any reason to foresee that his financial situation would subsequently deteriorate where he would not be able to repay the loan.

In addition, there is no evidence that either the debtor or the bank had any reason to believe that the debtor would need to access the trust funds to repay the loan. The fact that the debtor had the apparent ability to repay the loan when he obtained the renewal is consistent with an honest intention on his part to repay the loan. That, of course, is inconsistent with an intent to defraud the bank. In other words, the debtor had no reason to deceive the bank.

Furthermore, the undisputed evidence is that, after the loan was renewed, the debtor developed a drug habit which eventually ruined his career, drained his income, and destroyed his ability to pay his creditors. The fact that the bank's loss, (or more appropriately, Joslin's loss), ultimately resulted from apparently unforeseeable

14

calamitous circumstances suffered by the debtor <u>after</u> he allegedly provided a misleading financial statement, detracts significantly from the suggestion that the debtor intended to defraud the bank when he issued that statement.

Moreover, the debtor was required by federal law to disclose fully all of his assets on the form. Section 1014 of Title 18 of the United States Code provides:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014.

As such, if the debtor failed to list his interest in the trust on the financial statement, he could have been subject to criminal prosecution. So not listing his interest in the trust was not an option. Consequently, the debtor's listing of his interest in the trust is consistent with honest intentions, that is his good faith attempt to comply fully with the law and avoid committing a criminal act. That precludes any inference that his listing of the trust on the financial statement was a result of, or precipitated by, dishonest or fraudulent intent.

### D. The burden was on Joslin to prove that the bank, not Joslin, was deceived by information on the financial statement, and that the bank, not Joslin, reasonably relied on deceptive information in the financial statement.

Mr. Mike Harber, the Joslin employee who was instrumental in purchasing the package of 200 loans from the bank, testified that, in making the decision to purchase the loan package from the bank, he relied substantially on certain assumptions that he gleaned from the entry relating to the trust as that entry appears on the debtor's April 16, 1999, financial statement. Specifically, he said that, because the debtor is an attorney, he assumed that the debtor would not have listed his interest in the trust on the financial statement unless: (a) he could obtain access to that interest without restriction; and (b) his interest in the trust was "attachable" by the bank. The Court construes the term "attachable," as used by Mr. Harber, to refer to statutory collection remedies in general.

Section 523 of the Bankruptcy Code does not permit a construction which would allow a third-party assignee, who never dealt with the debtor, and was not provided with

15

a financial statement by the debtor, and did not loan money to the debtor, to assert nondischargeability of the assigned debt based on its own purported reliance on the financial statement supplied by the debtor to the bank.  Instead, the statute plainly authorizes a determination of nondischargeability only where a debtor has obtained money from a creditor who gave the debtor the money because the creditor relied on a written false financial statement provided to the creditor by the debtor.

Consequently, whether the assignee of a debt, (as opposed to the lender/assignor), contends that a representation contained in a written financial statement given by the debtor to the lender/assignor is false or misleading, and whether the assignee of the debt, (in accepting the assignment), relied on or was misled to its detriment by a false or misleading representation contained in a written financial statement given to the lender/assignor – to obtain a determination that the assigned debt is nondischargeable, for purposes of 523(a)(2)(B), the assignee must prove either of two additional circumstances.

One, the assignee may prove that it was either: (1) an entity or member of a class that the debtor intended to reach and influence by the representation; (2) a person or member of a class to whom the debtor had a public duty to communicate pursuant to a statute; or (3) a person or member of a class that the debtor had special reason to expect to be influenced by the representation.  Colonial Bank of Alabama v. Ridley & Schweigert, 551 So.2d 390, 396 (Ala. 1989)(involving Alabama law).  See also Tustin Thrift and Loan Association v. Maldonado, (In re Maldonado), 228 B.R. 735, 738 (9th Cir. BAP 1998)(specifically involving 523(a)(2)(B)); General Electric Capital Corp. v. Bui (In re Bui), 188 B.R. 274, 280 (Bankr. N.D. Cal. 1995)(specifically involving 523(a)(2)(B)); Long Island Trust Co. v. Rodriguez (In re Rodriguez), 29 B.R. 537, 540-541 (Bankr. E.D.N.Y. 1983)(specifically involving 523(a)(2)(B)).  As explained by the court in Tustin Thrift and Loan Association v. Maldonado:

> Although the maker of the representation is liable only if it is repeated to a person to whom he intends or has reason to expect to have it repeated, it is not necessary that he have any particular person in mind.   It is enough that he intends or has reason to expect to have it repeated to a particular class of persons and that the person relying upon it is one of that class.

228 B.R. at 738 (quoting Restatement (Second) of Torts, § 533, Comment G).

Two, the assignee may prove that the offending representation was false or misleading as to the lender/assignor and that the lender/assignor relied on or was misled by the representation to its detriment.  Federal Deposit Ins. Corp. v. Meyer (In re Meyer), 197 B.R. 277, 282 (N.D. Ill. 1996), aff'd, 120 F.3d 66 (7th Cir. 1997); Criimi Mae Services Limited Partnership v. Hurley (In re Hurley), 285 B.R. 871, 876 (Bankr. D.N.J. 2002); Bombardier Capital, Inc. v. Dobek (In re Dobek), 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002); Rumy v. Koritz (In re Koritz), 2000 WL 33954572, *8 (Bankr. E.D. Mo., Nov. 22, 2000); Tompkins & McMaster v. Whitenack (In re Whitenack), 235 B.R. 819, 826

(Bankr. D.S.C. 1998); Powell v. Judd (In re Judd), 207 B.R. 708, 716 (Bankr. D. Kan. 1997); Federal Financial Co. v. Gordon (In re Gordon), 1997 WL 736522, *2 (Bankr. E.D. Pa., Nov. 24, 1997); General Electric Capital Corp. v. Bui (In re Bui), 188 B.R. 274, 279 (Bankr. N.D. Cal. 1995).

Joslin had no transactions with the debtor. Joslin did not provide any money to the debtor. The debtor did not provide a financial statement to Joslin. Prior to orchestrating the assignment of the loan from the bank, along with about 200 other loans, Joslin had no knowledge of the existence of either the debtor or his loan, and vice versa.

In addition, there is no evidence that the debtor had any reason to believe that his loan would be assigned to Joslin, or to anyone else for that matter, or that the information on his financial statement would be repeated or communicated to anyone other than Mr. Smith and the bank. Therefore, Joslin's reliance vel non on the debtor's financial statement is of no moment and does not serve in any respect to prove its case for the nondischargeability of the debt owed as a result of the money loaned by the bank to the debtor.

Joslin's right and ability to assert the nondischargeability of the debt is, instead, completely derivative. It is not based on any representation made directly to it by the debtor. It is not based on any representation that the debtor intended or could have expected to reach Joslin. It is not based on Mr. Harber's, and therefore Joslin's, interpretation of any part of the financial statement given by the debtor to the bank. And it is not based on Mr. Harber's, and therefore Joslin's, reliance on anything which appears on that financial statement.

Joslin, by virtue of its assignment from the bank, stands in the bank's shoes and therefore has standing to assert nondischargeability only to the same extent that the bank could if it had not assigned the note. And since, as explained above, the record does not contain any evidence that the debtor put false or misleading information on his financial statement; or that the bank was deceived or misled in any way by any information that the debtor put on his financial statement; or that the bank relied to its detriment on any false or misleading information that the debtor put on his financial statement; or that the bank reasonably relied on to its detriment on any false or misleading information that appears on the debtor's financial statement; Joslin is not entitled to a determination that its debt, which it obtained by assignment from the bank, is nondischargeable pursuant to 523(a)(2)(B).

17

### E.  The testimony of Mr. Harber, Joslin's employee, contradicts and refutes Joslin's contentions, allegations, and accusations.

#### 1.  Joslin did not rely on the information contained in the debtor's financial statement relating to the trust. But if it did, its reliance was unreasonable.

Mr. Harber's testimony contradicted and refuted the contentions, allegations, and accusations on which Joslin attempted to build its case.

First of all, this Court cannot accept that Mr. Harber, and therefore Joslin, in making the determination to purchase the all-or-nothing loan portfolio from the bank, substantially relied on: (1) one entry in one financial statement; (2) which was almost three years old; (3) relating to one loan; (4) which made up less than two percent of the portfolio; and (5) which itself consisted of loans which the bank had ostensibly deemed to be questionable from a collection standpoint.  A more reasonable conclusion is: (1) because the financial statement was almost three years old; (2) coupled with the fact that the debtor was forced to renew the note four times during the course of that three year period; and (3) combined with the fact that the bank had ostensibly determined the loan to be uncollectible, a reasonable person would have suspected that the information reflected on the financial statement had changed, and that whatever assets still remained in the debtor's possession might not be readily attainable for purposes of collecting the loan.

In addition, Mr. Harber stated that, in his experience, the financial statements that he receives during the process of evaluating loan packages for purchase are often incorrect, and, because of the passage of time and the deterioration of borrowers' financial situations, sometimes assets listed on the statements no longer exist.   He testified:

Q.  The first thing you do after you buy a package of loans is these loans get assigned to loan officers?

A.  Yes, sir.

Q.  The very first thing they do is send out the "hello" letter and start trying to verify assets?

A.  Make contact with the individual to say ...

Q.  And use the balance sheet to see what you can collect from, right?

A.  Yes.  Get updated information and start talking about a restructure.

18

Q.  Exactly what you just said: get updated information.  Because you know the information is stale and might not be correct.  Am I correct?

A.  Yes.  Well in this particular case I had knowledge from Mr. Nelson that he had gone through some trouble.

Unofficial Transcript of Official Court Recording on July 7, 2005.

As the above testimony reflects, Mr. Harber, and therefore Joslin, had ample reason to suspect that the information contained in the debtor's financial statement would be incorrect and unreliable, based not only on Mr. Harber's experience in collecting and negotiating workouts involving similar loans, but also based on the verbal information which he had received from an officer at the bank named "Mr. Nelson." That information was to the effect that the debtor, "had gone through some trouble." Mr. Harber, therefore, had no reason to believe that the information in the debtor's financial statement would be correct and reliable.  That conclusion is supported by the fact that most of that information was no longer accurate.  Mr. Harber testified:

Q.  So part of why you thought that this was a loan that was collectible was on information that wasn't true, is that correct?

A.  I don't think that Mr. Nelson attempted to mislead me.

Q.  I didn't say that. Its just plain and simple not true information, is it?  He was not a practicing attorney in 2002.  You found out that didn't you?

A.  That's correct.

Q.  And you testified in deposition and again today that part of the reason that you thought that this was a collectible loan is because you were under the erroneous belief in 2002 that he was a practicing attorney, is that correct?

A.  That's correct.

Q.  Part of the reason you made this loan was under the erroneous belief that he had a house, and a 401(k), and a lot of other assets to, isn't that correct?

A.  Well, you said make this loan ....

Q.  I meant buy this loan as a collectible loan?

A.  I looked at the information on the balance sheet and I made a determination that felt this loan was truly worth the purchase.

19

....

Q.  You also testified on page 42 of the deposition that you relied on the bank reference that this was a good individual, been through tough times, and that he would be likely to restructure?

A.  Yes.

Q.  Wasn't that the main thing that you relied on?

A.  No, sir.

Q.  What was the main thing you relied on?

A.  I relied on a combination of things.  I relied on this balance sheet.  I relied on his profession as an attorney.  I relied on that character reference.

Q.  You have since found out that the balance sheet was predominantly incorrect because the majority of those assets, the $450,000 house, the 401(k), the life insurance, the money in the bank, all of those things, including the huge amount of money in 1998 that it showed down at the bottom of that sheet, were all gone, and that he was not a practicing attorney, and that he had surrendered his license, had been fired from his firm, and divorced and been through rehab.  Is that correct?

A.  Yes.

Q.  So the majority of all of those things that you relied on went out the window the minute that you started talking to Mr. Ogletree?

A.  Yes.  And that's when I started looking at restructuring the debt at a much lower level.

Unofficial Transcript of Official Court Recording on July 7, 2005.

It is apparent from Mr. Harber's testimony that he, and therefore Joslin, did not in fact rely on the information contained in the debtor's financial statement in determining whether or not to purchase the package of loans from the bank.  But if he did, such a reliance would have been unreasonable.

Mr. Harber knew that the information on the financial statement was probably incorrect because, in his experience, financial statements which he had reviewed in connection with the purchase of loan packages in general often proved to be incorrect. He knew that the information was probably incorrect based on what Mr. Nelson told him

20

about the debtor having gone through hard times. In addition, the financial statement was almost three years old, and was prepared by a borrower whose loan the bank had apparently deemed to be uncollectible. Otherwise, why would the bank have sold it for pennies on the dollar.

The information proved to be substantially incorrect. And Mr. Harber should have known that based on his experience, and because of what Mr. Nelson told him, and because of the other particular circumstances surrounding the loan purchase. So while Mr. Harber may have hoped that some of the information was still correct, or may have speculated that some of the information might still be correct, it is not easy to accept that he, in fact, depended on the accuracy of any of that information, or counted on the accuracy to any material degree in deciding whether or not to spend $500,000 for all of the loans. And if he did, it is apparent that he should not have. He had no reason to, and in contrast, had ample reason not to. And given the numerous glaring red flags which warned him of what inevitably proved to be true, that is, the debtor had no significant assets from which Joslin would be able to collect the loan, it was unreasonable for him to have done so.

In addition, Mr. Harber's testimony reflects that he knew that restrictions often impede the ability of the beneficiary of a trust, as well as creditors of that beneficiary, to access the trust funds. He testified:

Q. Now let's talk about the trust. You testified in deposition, I believe on page 20, that you thought that the trust could be attached, that because it said that it was a trust on there, that you didn't know what trust meant and that you thought that it was an asset that could be immediately by a creditor, is that correct?

A. I believe what I said that day was that there are several types of trusts and that I did not know exactly what type of trust that was but that by his including it on his balance sheet that I relied on his education and his sophistication as an attorney to know whether or not it should be included on the balance sheet or not.

....

Q. OK. So what is the difference between that and a trust where Mr. Ogletree can go get the money and you admit and now acknowledge that you now know that he could go get the money or ask for it and the trustee has to agree. How is that different than a 401(k) where an employer might not let you go get it?

A. Well there's age requirements to be able to withdraw from a 401(k).

Q. And there may be in a trust too?

21

A. Pardon.

Q. And there might be in a trust as well. There might be age requirements in a trust too, right?

A. Yes.

Q. Have to be over 19, or 30, or 40, or 50, or whatever?

A. Yes. At 35 it becomes his or ... yes, there's all sorts of things.

Q. Are you aware that the definition of a trust is something that is being held by someone else and requires the permission of someone else to get. Are you aware that that's the definition of a trust?

A. Yes.

....

Q. The definition in Black's law dictionary of a trust is money being held by somebody else for someone's benefit. Are you aware that that's possibly the, can we at least agree to that much of a trust?

A. Yes.

Q. And that in that definition that somebody else is holding that money so when you saw that word trust on that financial statement you should have known that somebody else was holding that money, not Mr. Ogletree, is that correct?

A. I didn't know if that trust had matured or not but I did know that there was probably a trustee in place or it was at one time.

Q. So you admit and acknowledged that you were placed on notice that that financial statement accurately reflects that there was a trust, if it still existed, that it was in the hands of someone else?

A. Yes. But the issue has become how much control he had of being able to have the trustee release.

....

Q. Well on page 24 of your deposition you stated that you had seen a trust before and you have seen trusts listed on financial statements before, haven't you?

22

A.  Yes.

Q.  And you also stated on page 24 of the deposition that copies of them were usually in the loan file?

A.  They can be.

Q.  You said usually.

A.  Usually.

Q.  But there weren't in this case?

A.  No.

Q.  That didn't raise a red flag to you?

A.  No.

Q.  Didn't cause you to ask the bank if they could have happened to misplace it, could it be anywhere else, you didn't ask the bank that did you?

A.  No.

Q.  Because you didn't want to intrude on the bank and maybe mess up the relationship?

A.  They told me that all the information was available in the loan files.

....

Q.  Based on what you told Mr. Stuckenschneider, is it your opinion that if a creditor cannot attach it, and if a debtor, excuse me, a borrower cannot get to it without strong restrictions, it should not be listed on the personal financial statement?

A.  It should not be listed or it should be listed with some type of clarification ....

Q.  With an explanation?

A.  Yes.

Q.  And in this case the explanation would have said this is a trust which has not vested and I have to ask permission?

A.  Yes.

Q.  That would have been the correct way to list it in your opinion?

A.  Yes.

Q.  In your opinion, because he didn't list it that way, or because he put no restrictions on it you felt like and assumed that it was an asset available to him without restrictions?

A.  Yes.

Unofficial Transcript of Official Court Recording on July 7, 2005.

Therefore, Mr. Harber necessarily knew that the trust listed by the debtor on his financial statement might likewise be encumbered with similar restrictions. Consequently, he could not have possibly come to the contrary conclusion, that is, the trust listed by the debtor was not subject to any such restrictions.  If he did, that would have been contrary to the suggestion that his reliance was reasonable.

The evidence causes the Court to ask these questions. Why would Mr. Harber think that Joslin would be able to collect the loan from the trust when the bank had apparently been unable to do so?  Why did Mr. Harber think that the bank would sell the loan so cheaply if there was a ready asset to collect it from listed on the debtor's financial statement?  Why would not the fact that there were no trust documents in the loan file, even though such documents were ordinarily found in loan files where trusts had been listed by borrowers as potential assets, have alerted Mr. Harber to the possibility that there were restrictions in the debtor's trust that might impede Joslin's ability to collect the loan from it?

A reasonably prudent person standing in Mr. Harber's shoes, exercising due care, would have obtained additional information regarding the trust, or, barring that, would have elected not to purchase the loan portfolio, if, indeed, that one entry was of such momentous importance to the whole transaction.  Since Joslin did neither of those things, but instead purchased the portfolio purchase without verifying whether or not it could collect the debt from the trust property, its so-called reliance on the debtor's listing of the trust on the financial statement was unreasonable.

**2.  Mr. Harber refuted his own allegations that,
by listing the trust on his financial statement, the
debtor implicitly made the false representation
that the debtor could readily access the trust to pay the loan.**

Mr. Harber testified that Joslin's case is based on the premise that, by merely listing the trust on his financial statement, the debtor implicitly made the representation that he would be able to readily access the trust funds to pay the bank and that the bank would be able to "attach" the trust to pay the debt.  Mr. Harber testified:

> Q.  Based on what you told Mr. Stuckenschneider, is it your opinion that if a creditor cannot attach it, and if a debtor, excuse me, a borrower cannot get to it without strong restrictions, it should not be listed on the personal financial statement?
>
> A.  It should not be listed or it should be listed with some type of clarification ....
>
> Q.  With an explanation?
>
> A.  Yes.
>
> Q.  And in this case the explanation would have said this is a trust which has not vested and I have to ask permission?
>
> A.  Yes.
>
> Q.  That would have been the correct way to list it in your opinion?
>
> A.  Yes.
>
> Q.  In your opinion, because he didn't list it that way, or because he put no restrictions on it you felt like and assumed that it was an asset available to him without restrictions?
>
> A.  Yes.

Unofficial Transcript of Official Court Recording on July 7, 2005.

However, Mr. Harber did not define what he meant by "restrictions" or explain those "restrictions."  Nor did he testify that the debtor's ability to obtain money from the trust is "restricted" or subject to "restrictions" or explain what "restrictions" the debtor's ability to obtain money from the trust are subject to.  Of course, the validity of his contention regarding the debtor's failure to disclose that his ability to draw from the trust

funds was not unrestricted, presupposes that there are restrictions attached to the debtor's ability to draw from the trust funds. Otherwise, the debtor's implicit representation, that is, that his ability to draw from the trust funds was unrestricted, would be true and could not, therefore, form the basis for a determination of nondischargeability pursuant to 523(a)(2)(B). But Mr. Harber also enigmatically testified that he firmly believes that the debtor can readily gain access to his interest in the trust funds if he wants to, and that he has always possessed that ability. That position, of course, contradicts his contention that the trust was not accessible without restriction by the debtor. Mr. Harber testified:

Q. You never asked Mr. Nelson about the trust, did you?

A. No.

Q. When he said that he was a practicing attorney and he has got good character, and I think that you can collect it, you went out the door, that was it for you wasn't it?

A. Along with the balance sheet and the listing of assets.

Q. Which you now found out was erroneous because he lost all of it?

A. Well he hasn't lost all of it. He still has the trust.

Q. And that's what you want him to go get this money from isn't it?

A. He has the ability to do that.

Q. And so that's why you're here today is because you want him to go get money from that trust to pay you and that's what's sticking in your craw today isn't it?

A. I wouldn't say sticking in my craw. That is the position Dennis Joslin Company taking that an individual has the ability to repay their obligations should be asked to pay.

Q. Well then let me ask you this question: is his ability to go get that money today from the trust any different than it was back in 1999 or is it the exact same ability?

A. I think he has the exact same ability. He got money out of that trust before and he is able to get money out of it today.

Unofficial Transcript of Official Court Recording on July 7, 2005.

26

This testimony reflects that, according to Mr. Harber, the debtor can in fact access the trust funds to repay the loan, which is precisely one of the implicit representations that Mr. Harber testified that he relied on in deciding to purchase the loan package from the bank. And since that implicit representation is, by Mr. Harber's own admission, **true**, it cannot possibly, contrary to Mr. Harber's enigmatic assertion to the contrary, constitute a "statement in writing that is materially **false**" for purposes of section 523(a)(2)(B).

### 3. Mr. Harber contradicted his own allegations that, by listing the trust on his financial statement, the debtor implicitly made the false representation that it could be "attached" by creditors and that Joslin reasonably relied on that implied representation.

As indicated above, Mr. Harber testified that the debtor should not have listed his interest in the trust on the financial statement if it could not be "attached" by creditors. But Mr. Harber also acknowledged that debtors sometimes list trusts on financial statements which are not "attachable" by creditors because they may be able to voluntarily obtain access to the trusts to pay their loans, and that debtors often place other assets on financial statements which are not "attachable" by creditors, such as retirement accounts and 401(k) plans, for the same reason. He testified:

Q. Well on page 24 of your deposition you stated that you had seen a trust before and you have seen trusts listed on financial statements before, haven't you?

A. Yes.

....

Q. You said that there were only two main assets on the balance sheet that you relied on, your original testimony said that, that was the house and the trust?

A. Yes, sir.

Q. When I asked you about the retirement and the 401(k) you said that you looked at that differently because you weren't sure it could be attached by creditors?

A. Yes.

Q. But yet you assumed the trust could be attached by a creditor?

27

A.  Yes.

Q.  And that was based on your assumption not on anything you saw in the loan package?

A.  It was based on my assumption that Mr. Ogletree wouldn't have disclosed it on the balance sheet if it hadn't been attachable.

Q.  Well, I think we've already said but he disclosed the 401(k) and the retirement plan on the balance sheet and you knew they weren't attachable?

A.  Yes, sir, but the law is very clear on 401(k)s and retirement plans.

Q.  But they are assets that debtors could possibly reach, could possibly reach in the event of a hardship?

A.  Yes.

Q.  Same thing with the trust, so that's why they're disclosed on financial statements aren't they?

A.  Yes.

Unofficial Transcript of Official Court Recording on July 7, 2005.

Mr. Harber admits that debtors sometime list trusts on financial statements even though the trusts are not "attachable" by creditors because they might be able to voluntarily gain access to the trusts to pay their loans.  Because of that admission, this Court cannot accept Mr. Harber's other testimony that he assumed that the debtor in this case would not have listed his interest in the trust on his financial statement unless he believed that it was "attachable" by creditors.  That testimony is rendered even less credible by his admission quoted above, that debtors often list other "non-attachable" assets on their financial statements for the same reason.  That testimony is also not aided by Mr. Harber's ambivalent testimony quoted below, on whether a debtor should list non-attachable assets on his or her financial statement.  He testified:

Q.  And it was your opinion that [the trust] shouldn't have been on the balance sheet at all, am I correct?

A.  If it wasn't subject to being available for a creditor, it shouldn't have been on the balance sheet.

Q.  So the 401(k) and retirement account shouldn't have been on the balance sheet either?

Case 04-00139-BGC    Doc 34    Filed 01/05/06    Entered 01/05/06 11:21:33    Desc Main
Document      Page 28 of 31

A.  No.

Q.  But yet you saw it and instantly knew that it wasn't attachable by creditors but it was there anyway?

A.  A 401(k) is a retirement plan and there are very clear guidelines on attachment of them.  But a trust is different.  There can be a number of types of trusts.  There can be a lot of different things that can be available. So I assumed because he had listed this that, it might have just been a title that he put on there, that this was available for a creditor.

Q.  But yet you've acknowledged the 401(k) that was listed on there wasn't available for a creditor as far as being able to be attached.  It was something go get ...

A.  Yes.

Q.  and you ...

A.  And I have had debtors that would go cash in there 401(k) to make a settlement with me.

Q.  Exactly.  So that why its important to be on a financial statement isn't it?

A.  Yes.

Q.  Even though its not something you can go get?

A.  Right.

Unofficial Transcript of Official Court Recording on July 7, 2005.

    Other salient considerations detract substantially from the credibility of Mr. Harber's testimony that, in his mind, the debtor, by listing the trust on his financial statement, implicitly represented that it was "attachable" by creditors.  First of all, Mr. Smith, a very experienced and accomplished banker, testified that, even though he was never under the impression that the trust was "attachable," he believed that it was a significant asset with value that served to increase the debtor's net worth, which would lead one to believe that the trust was properly listed on the financial statement.

    Second, Mr. Harber is presumed to know the law relating to his transactions, United Companies Lending Corp. v. Autrey, 723 So.2d 617, (Ala. 1998).  That law would include 18 U.S.C. § 1014, quoted above, which ostensibly makes it illegal not to list assets, whether "attachable" or not, on one's loan application or a financial

29

statement given in connection with obtaining an extension or renewal of credit from a federally insured bank. He should have known, therefore, that not listing an interest in the trust on the financial statement was, therefore, not an option because that omission would have left him open to possible criminal prosecution. Furthermore, had the debtor not listed his interest in the trust on the financial statement, the debtor would have left himself open to possible civil repercussions as well. Those might have included a charge of fraud in this or some other proceeding, based his failure to list the asset rather than his failure to leave it off. In light of the potential deleterious criminal and civil consequences of not listing his interest in the trust on the financial statement, there is no wonder that the debtor listed it. And Mr. Harber should have known that the debtor would have listed it whether it was "attachable" by creditors or not, especially since the debtor is an attorney and therefore more likely to be profoundly conscientious about the law and the consequences of not following it.

In addition, since Mr. Harber is not employed by the bank, and has never worked for the bank, he cannot presume to know what the bank did or did not want the debtor to disclose on his financial statement. And he did not purport to have any knowledge, first hand or otherwise, of what the bank may or may not have wanted the debtor to put on his financial statement. His statements regarding what the debtor should or should not have put on his financial statement, therefore, are speculative and do not represent probative evidence on the issues at hand. This is especially true since he did not participate in the transaction which resulted in the renewal of the debtor's obligation to the bank and that the participants in the transaction were present in court and available to testify regarding what was expected and what occurred in connection with that transaction. In short, he has no basis upon which to declare on behalf of the bank that the debtor should not have listed his interest in the trust on the financial statement. That was for the bank to say, which it did not, although Mr. Smith was given the opportunity to do so.

Based on the above, the Court must conclude that it would have been unreasonable for Mr. Harber, and therefore Joslin, to have assumed that the debtor would not have listed his interest in the trust on his financial statement if it was not "attachable" by creditors. Consequently, no representation to the effect that the debtor's interest in the trust was "attachable" by creditors can be implied or inferred from the mere listing of it on the financial statement. Furthermore, because of the inherent improbability of Mr. Harber's conclusions, the Court concludes that he, and therefore Joslin, did not in fact make that assumption or rely on it in making their decision to purchase the loan package from the bank.

### F. The debtor may not be awarded attorney's fees pursuant to 11 U.S.C. § 523(d) because there is no evidence that this case involved a "consumer debt."

The debtor requested an award of attorney's fees pursuant to section 523(d) of the Bankruptcy Code. 11 U.S.C. § 523(d). That section provides:

Case 04-00139-BGC    Doc 34    Filed 01/05/06    Entered 01/05/06 11:21:33    Desc Main
Document      Page 30 of 31

If a creditor requests a determination of dischargeability **of a consumer debt** under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that **the position of the creditor was not substantially justified**, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d)(emphasis added).

Joslin's position in this case was not substantially justified. That is without question. However, section 523(d) is applicable only if a creditor requests a determination of dischargeability of a <u>consumer debt</u>. A "consumer debt" is defined in section 101(8) of the Bankruptcy Code as a, "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).

The debtor testified that he obtained the loan in April 1998 from the bank for the purpose of consolidating other debts. He did not describe what types of debt were consolidated into the April 1998 loan or otherwise describe how he spent the proceeds of the loan. And while some of the loan documents do state that the purpose of the loan was for "personal expenses," (see Plaintiff's Exhibits 1, 2, and 4), and the debtor testified generally about a gambling problem, the debtor did not offer any <u>specific</u> evidence that would allow the Court to conclude that the loan was for a consumer debt. Consequently, the Court cannot find any evidence that the loans and renewals involved in this case were obtained by the debtor for a personal, family, or household purpose. The Court must therefore find then that an award to the debtor of costs and attorney's fees in this case is not available pursuant to Section 523(d).

## IV. CONCLUSION

Based on the above, the Court concludes that the <u>Complaint to Determine Dischargeability of Debt Under 11 U.S.C. 523 and Objection to Discharge Under 727</u> filed on August 11, 2004, by the plaintiff, Dennis Joslin Company, is due to be denied, and that the debtor's request for an award of attorneys fees pursuant to 11 U.S.C. § 523(d) is also due to be denied.

A separate order will be entered in accordance with this Memorandum Opinion.

Dated: January 5, 2006        <u>/s/Benjamin Cohen</u>
                                       BENJAMIN COHEN
                                       United States Bankruptcy Judge